UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORMA C. SULLIVAN<br>and<br>DONALD E. SULLIVAN,<br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br>Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 99-754C<br><br><br><br>Senior Judge Loren A. Smith |

**PLAINTIFFS' AMENDED AND SUBSTITUTED TRIAL BRIEF**

## I. PREAMBLE

Judgment of Liability against Defendant has entered. Stipulations set forth at 18-4 to 18-6 explain liability facts. The issue of Damages as to each Plaintiff was tried before this Court, sitting in Boston, with trial commencing on May 28, 2008. Plaintiffs filed in evidence Two Volumes of Exhibits. Defense Counsel graciously agreed to paginate an Exhibit Book. Plaintiffs' Counsel asked for and received a one week continuance to the filing of this Brief for the reason that Defense Counsel, Attorney Reid Prouty informed that it slipped his mind to prepare the paginated Exhibit Book timely. Plaintiffs' Counsel received via Federal Express that paginated Exhibit Book this week and makes references to that Book. Exhibits that were entered in evidence at Trial after the unpaginated Exhibit Book offered by Plaintiffs in evidence at trial did not make it into Attorney Prouty's paginated Exhibit Book. One example of such Evidence is Attorney Creedon's Affidavit (Plaintiff's Expert), another is records of Chiropractor (Plaintiff has listed as Ex 26). If Attorney Prouty wishes to add to his paginated Exhibit Book, Plaintiffs have no objection and will make reference to additions in their Rebuttal Brief.

## II. THE ARGUMENT

Evident from the testimony of Sullivan family members was that Mrs. Sullivan had a life altering injury visited upon her on August 17, 1995 (accident). A bright time line comes from the remembrances of the Police Officer son on discharge from the military. His mother's mobility was never the same after this accident with the Truck that caused Mrs. Sullivan's injuries. Mrs. Sullivan herself testified to her post accident suffering that continues up to the present time (with 4 recent cortisone injections and present back pain 70% of the time) now 13 years after this accident. Early medical corroboration is found in Mrs. Sullivan's Good Samaritan Hospital record. This Good Samaritan Hospital record in Emergency Room begins in Attorney Prouty's Exhibit Book at 2-1 and extends to 2-8. By agreement of the parties the first number is the Exhibit Number and the second number after the hyphen is the page number of that Exhibit. Further references herein are parenthetical referrals to Exhibit Number and Page(s).

Mrs. Sullivan was a front seat passenger who complained of neck and upper back pain at Good Samaritan Hospital; there Doctors noted "neck snapped" (2-2). Low back pain with neck snap is noted on next type written Good Samaritan Hospital record page (2-3). Strains, though first thought to be mild, are recorded (2-3) at Good Samaritan Hospital, diagnosis is that strains are to neck and low back. Neck x-rays show straightening of lordotic curve (2-7) and thus confirm the patient complaint of neck snapping.

The first page of the Chiropractic records have pain circled as "SEVERE"; the date is November 12, 1995 (3-1). Mixed in Exhibit 3 at 3-8 to 3-10 are 2006 records of Neurology Associates of Ormand Beach.

## III. MEDICAL BILLS

Charted at 18-7 is a chronicle of accident caused medical bills up to Columbia Medical Center in Florida on 2/27/98. Within that chart are specific listings of medical bills totaling $17,522.32. Medical bills continue to present beyond the charted sum. There are bills for services for this back injury in other Exhibits, especially from 2006 on. Medical bills are but one element of damages under Massachusetts Law. Like medical reports, bills may only be entered in evidence when there is strict compliance with 233 Sec 79G of Massachusetts General Laws (MGL).

> "Chapter 233: Section 79G. Medical and hospital services; evidence...
>
> Section 79G. In any proceeding commenced in any court, ...an itemized bill and reports, including hospital medical records, relating to medical, dental, hospital services, prescriptions, or orthopedic appliances rendered to or prescribed for a person injured, or any report of any examination of said injured person, including, but not limited to hospital medical records subscribed and sworn to under the penalties of perjury by the physician, dentist, authorized agent of a hospital or health maintenance organization rendering such services or by the pharmacist or retailer of orthopedic appliances, shall be admissible as evidence of the fair and reasonable charge for such services or the necessity of such services or treatments, the diagnosis of said physician or dentist, the prognosis of such physician or dentist, the opinion of such physician or dentist as to proximate cause of the condition so diagnosed, the opinion of such physician or dentist as to disability or incapacity, if any, proximately resulting from the condition so diagnosed; provided, however, that written notice of the intention to offer such bill or report as such evidence, together with a copy thereof, has been given to the opposing party or parties, or to his or their attorneys, by mailing the same by certified mail, return receipt requested, not less than ten days before the introduction of

> same into evidence, and that an affidavit of such notice and the return receipt is filed with the clerk of the court, agency or commission forthwith after said receipt has been returned. Nothing contained in this section shall be construed to limit the right of any party to the action to summon, at his own expense, such physician, dentist, pharmacist, retailer of orthopedic appliances or agent of such hospital or health maintenance organization or the records of such hospital or health maintenance organization for the purpose of cross examination with respect to such bill, record and report or to rebut the contents thereof, or for any other purpose, nor to limit the right of any party to the action or proceeding to summon any other person to testify in respect to such bill, record or report or for any other purpose.
>
> The words "physician" and "dentist" shall not include any person who is not licensed to practice as such under the laws of the jurisdiction within which such services were rendered, but shall include chiropodists, chiropractors, optometrists, osteopaths, physical therapists, podiatrists, psychologists and other medical personnel licensed to practice under the laws of the jurisdiction within which such services were rendered.
> The word "hospital" shall mean any hospital required to keep records under section seventy of chapter one hundred and eleven, or which is in any way licensed or regulated by the laws of any other state, or by the laws and regulations of the United States of America, including hospitals of the Veterans Administration or similar type institutions, whether incorporated or not.
>
> The words "health maintenance organization" shall have the same meaning as defined in section one of chapter one hundred and seventy-six G."

Mrs. Sullivan advances these points. This court should not receive, weight, or consider Defendant's medical evidence, as Defendant fails to comply with the mandatory requirements of Chapter 223 Sec 79G of Massachusetts General Laws (MGL). Next, Defendant's medical expert evidence consists of a report. This report cannot be given any weight for not only does it fail in meeting certification requirements, but even if certified, Defendant's expert is not an examining physician as is required under statute. MGL Chapter 233 Sec 79G considerations apply both to consideration of evidence in this case and theoretical prosecution in underlying tort case, had Government taken steps to assure

contracting party (Sanders) had $750,000 in insurance coverage under Government contract (18-5, Para 10 and 11).

Obviously, there is no requirement that a tort case settle. To prosecute any case that fails to settle in Massachusetts, there must be compliance with Chapter 233 Sec 79G of MGL, otherwise reports are not admissible in evidence. A report that fails to satisfy Chapter 233 Sec 79G of MGL is hearsay and cannot be given evidentiary weight.

## IV. INTEREST

Massachusetts law sets interest on all tort actions at 12% per annum. Legal experts testifying on both sides of the case agreed on the statutory amount of interest. This is not post judgment interest to be awarded to a prevailing party in case at bar. It is interest that is part of the damages. It is interest for the amount of time the Sullivans have been deprived of their money from a theoretical settlement or trial of the underlying tort.

Damages at the rate of 12% per year must be awarded each of the Sullivans. Each of the experts testified that it was likely that case would settle in 2 years after accident had sufficient insurance coverage been in place. Each expert reasoned that most cases settle and there were no special factors in Sullivan cases (she for her damages and he for loss of consortium) that made their cases distinguishable from the norm in regard to expectations of settlement. Assuming position most favorable to Government, that no suit was filed for two years, then interest should be applied at 12% per month from August 17, 1997 to present on the total damages. Attorney Gluck for the defense testified that he failed to consider the interest factor in making his calculations, although he agreed on theory and rate with Plaintiffs (see cross examination). Attorney Gluck's testimony was that Attorney Prouty gave him narrow assignment of just determining what Attorney

Gluck thought a likely settlement value to be. Attorney Ron Gluck determines both Sullivans to have total damages $52,592 in this case (23-6); he takes out of damage consideration bladder surgery as his opinion is "no causation" (23-5). As will be seen in Section IX, infra, as to Dr. Just's report, Attorney Gluck should not have made this subtraction. Attorney Creedon Affidavit (Exhibit) and testimony valued claims with interest at $477,521.06. Attorney Creedon Affidavit (Exhibit) and testimony calculation is as of August 7, 2006 and thus warrants interest of another two years on his figure. Attorney Gluck conceded at trial that there is no interest in his calculations. The causation link for uroligical element of damage came in after Attorney Gluck's report. See Dr. Just report of July 1, 2007 (11-1) and Attorney Glick report of November 16, 2006 (23-1) later discussed. Parenthetically, Plaintiffs point out that Attorney Gluck came to his expert legal opinion for U.S. even before the U.S. medical expert (Dr. Glick) renders the defense expert medical report.

The interest agreed upon by legal experts testifying at trial comports with Massachusetts law.

> "Chapter 231: Section 6B. Interest added to damages in tort actions Section 6B. In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law."

## V. CONSORTIUM

Trail evidence consisted of opinions of $8,000 from Attorney Gluck and $35,000 from Attorney Creedon as to the loss of consortium by Mr. Sullivan. The Court will

recall the couple's children were excused from the Courtroom while the Sullivan's testified to diminution in sexual relations which started shortly after the accident and continues to present. Attorney Creedon pointed to an obvious factor in his testimony, namely that the children had grown and there is an obvious bond and attachment that has incurred over the years for this loving couple. Testimony of the Sullivans gave insights to accident caused restrictions of movement of Norma Sullivan, in which her range of movement was decreasing significantly, affecting not only Mrs. Sullivan's ability to work as she had, as a cleaner, but also to perform household cleaning chores and to go for walks with her husband. Elements of consortium damages are these spousal interactions and the joy of the relationship.

## VI. FAIR SUM FOR MRS. SULLIVAN'S SUFFERING

It has been 13 years since this accident. Even with cortisone shots the trial testimony of Mrs. Sullivan, without refute, is that she now continues to suffer 70% of the time she is awake. A logical inference is that before these injections her degree and frequency of suffer was even greater. What does a finder of fact expect when there has been a herniated disc?

A damage assessor may consider each day, week, month or even year of those 13 years to make a fair award. But the Court does not stop there. Herniated disks, the experts concede in testimony, do not abate. They do not un-herniate. The bulge is out. The bulge does not go back into its cushion position in the lumbar spine. If anything, the testimony goes, ADLs (activities of daily living) increase the pain, i.e. bend the wrong way and it not only hurts now, it makes you more susceptible to further pain and loss of motion in the future, all stemming from the causative flow of events from this accident. "Patient

states severe back pain, nausea for week" as of 6/13/07 Good Samaritan Hospital Emergency Room record (10-2 - see also et seq., esp. 10-4 that patient is still wearing a back brace).

If one were to consider only paying Mrs. Sullivan the minimum wage during her waking hours (there is sleep disturbance also in the evidence) or increase to $10 per hour for the severity of her pain, a minimum calculator then is reasonable. Without overtime there is payment on 10 1/2 hours a day (16 waking hours x 70%). At 7 days per week that is a weekly sum of $735 x 52 weeks per year x 13 years produces the arithmetic way of a quantification of damages, tied to some known factor (minimum wage). Should we not pay people for their pain at least as much as we require employers to pay workers for the entry level to the workforce?

An award of damages is not limited to past damages in tort for pain and suffering. A fundamental is that fair, full and complete damages are a one time award. Life Tables are used in all states and under the Federal Rules to assist in future damages. Mrs. Sullivan's date of birth is 10/25/35. Life Table is in evidence, it is however blurred (18-8); it would be hard to deny Mrs. Sullivan a life expectancy of at least 10 years. A slight reduction to present value of those damages is in order under Massachusetts law. Using minimum wage formula = min wage x 16 (waking hours) x .7 (70% of time with pain) x 52 (weeks in year) x 23 (post accident living + future life expectancy) deduct a discount of futures for present value and a figure of $650,000 is achieved. The figure for pain and suffering for Mrs. Sullivan is higher if she is awarded $10/hr for her pain (slightly over $800,000). This is for pain and suffering which must have added to it, loss of earning

capacity and medical bills for care and attendance and that sum then receives interest application.

Pain and suffering pegging to an hourly rate is reasonable. There is hourly suffering. Law acknowledges, and Judges instruct Juries, that there is not a mathematical formula to use when making an award for the intangible of pain and suffering. Professionals, such as Attorney Creedon, Plaintiffs' expert, came to a total sum which today, with interest added would be about $500,000 for total damages. The hourly pain and suffering calculation causes algebra type of total in excess of Attorney Creedon. Attorney Creedon used the total and partial disability formula often utilized in the insurance industry and in place at the time of the presumptive settlement offer (two years post accident). If trial were to take place, there would be no bounds under Massachusetts law and any judgment in excess of the $750,000 in coverage the Government contracted truck should have had in place, is due and payable by the insured. However for purposes of this case Plaintiffs concede their measure of damages is limited to $750,000 for the reason that it is likely that that sum would have been accepted from the insurance carrier for the properly insured truck, if that sum were offered and even if the offer came after an excess verdict.

## VII. ATTORNEY CREEDON AND THE FORCE OF LAW TO SETTLE IN MASSACHUSETTS

Plaintiffs' legal expert, Attorney Robert S. Creedon, Jr., came to Court with 40 years of experience at the bar. A centerpiece of Attorney Creedon's practice over that span of time has been negotiating, trying, and settling thousands of personal injury claims and cases. This expert utilized the weekly total and partial disability sums traditionally

allocated in the insurance industry to make offers of settlement. It is not altruism alone which motivates Insurance Companies writing in the Commonwealth of Massachusetts to make prompt, fair and equitable offers of settlement. Attorney Creedon opined that in cases of this nature, an expectation was that the carrier would have settled in the earlier stages of the claim and Attorney Creedon predicted the herniated disc even before present confirmation came from Florida doctors. Dr. Sullivan, in the stage of his medical practice that he was then at, did not make salient observations about his patient that Attorney Creedon pointed to in his testimony. First, in support of Attorney Creedon, one must look at Massachusetts law. There is requirement for Massachusetts insurance companies to move on personal injury claims expeditiously and fairly under force of law. If the carrier does not capitulate to a settlement demand made on behalf of an injured claimant, exposure is direct to the insurance company for treble damages plus attorneys' fees. The interplay of MGL Chapter 93A Sec 9 and MGL Chapter 176D Sec 3(9)(f) provides strong motivation for the carrier to expeditiously move on claims. Well known to Massachusetts practitioners and the Insurance Industry are these statutes.

> "Chapter 93A: Section 9. Civil actions and remedies; class action; demand for relief; damages; costs; exhausting administrative remedies Section 9. (1) Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued there under or any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court,............(3) At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is

rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. ........For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper.....Said damages may include double or treble damages, attorneys' fees and costs, as herein provided"

CHAPTER 176D. UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN THE BUSINESS OF INSURANCE

"Chapter 176D: Section 3. Unfair methods of competition and unfair or deceptive acts or practices

Section 3. The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:—

(9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions

b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies

(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; "

With motivation in place back in the 1995 to 1997 era to settle, had the proper amount of coverage ($750,000) been in place, the question then would have been what are the medicals that support both Attorney Creedon's testimony and the value that this Court would now say is the total fair value of the Sullivans' claims. The Court may recall Attorney Creedon testifying that Dr. Sullivan ordered an MRI in 1995 when he had not ordered an MRI back in 1988. Seven years earlier the defense wished to make mention

that Norma had complained of back ache and also that Mrs. Sullivan, post this accident, felt her back hurt while she was hanging curtains and shaving her legs. Credence is not with this defense postulation. If there had been merit there is no place for the factual proposition in Massachusetts law as the record is obvious that the back pain was silent before this accident. A defendant is held responsible for those damages that naturally flow from the combined effect of his wrongful conduct and any preexisting disease or condition of the plaintiff.

See:

1. Wallace v. Ludwig, 292 Mass. 251, 198 N.E. 2nd 159, 162 (1935).
2. McGrath v. G. & P Thread Corp., 353 Mass. 60, 63, 228 N.E. 2nd 450, 453 (1967).

Trial transcript will show, and these points have independent strength, during cross examination of Attorney Gluck, this defense expert was forced to concede on but one occasion in Mrs. Sullivan's life did certain factors occur. Those factors were crashing of vehicles (the severity of which can be seen in Exhibits 13, 14, 15 and 16), ambulance called, taking away of Mrs. Sullivan from the scene on a stretcher, Emergency Room treatment on the heels of the event and a later MRI. None of those factors occurred pre or post this accident. All of these factors take place in Mrs. Sullivan's life but one time. That time is the time of this accident of August 17, 1995.

Attorney Creedon made the following points with respect to Dr. Sullivan's treatment of his patient. Mrs. Sullivan has had back pain since this accident and 1988 back pain went away and patient had no trouble form that time up to this accident (11/20/95 note at 4-1). Chiropractic treatment had begun on August 17. Attorney Gluck conceded that MRI films order by Dr. Sullivan on December 6, 1995 show L3-4 disc

herniation (last sentence on 23-2). The "miracle office visit" is on 12/11/95. Mrs. Sullivan denied in her testimony ever saying any back miracle to Dr. Sullivan. Further Plaintiff testified that use of "miracle" as an expression is not one in her lexicon. Dr. Sullivan's recording of that event is at 4-2 where he also is ordering a CT Scan after just ordering a MRI. Attorney Creedon pointed out in his testimony that there is no mention of Dr. Sullivan remembering he ordered the MRI, looking at the films, looking at the radiologists report (as mentioned above in Attorney Gluck's report) or figuring out how he can be recording that a miracle of pain relief takes place on 12/11 when there is abundant recording of back pain in visits Dr. Sullivan had with Mrs. Sullivan in the visits before and after. Example in 11/30 visit the doctor records back is "terrible" (4-2) and at that time doctor tells his patient not to go to Florida (as she usually had in winter time) (second to last sentence of this visit at 4-2). In March the doctor records that his patient is having back pain and that her back has been going out since the accident, giving her a back brace and narcotic analgesics for her back pain (4-3 to 4-4). A better back brace is ordered later in March of 1996 after two calls from Mrs. Sullivan of clicking in her lower back. All the symptoms of a herniated disc are present according to Attorney Creedon's professional experience in this regard. Proof positive is right there in the MRI. But Dr. Sullivan never looks, never treats. A principle of tort law is that medical malpractice is not a superceding intervening event. Medical malpractice does not break the chain of causation.

See:

1. <u>Champion v. Upjohn Co.</u>, 1993 Mass. Super. LEXIS 26 (Mass. Super. Ct. Dec. 23, 1993) (copy of decision is appended)

Therapy for Mrs. Sullivan's spine does take place in late 1997 into 1998 (7-1 to 7-10); physical therapy is primary for the neck (7-7). It can be seen on 3/16/98 prescription that the herniated disc lumbar is recorded as 1 of 3 reasons for issuing PT (7-10).

## VIII. THE FLORIDA DOCTORS

Solid standing alone and further buttressed by Attorney Creedons' testimony is the report of Dr. Wierzbicki. It is found at 8-7. All of Dr. Wierzbicki's records and bills are found in Exhibit 8. Dr. Wierzbicki compares December 1995 spinal study with that in Florida in 2006. and finds "progressive worsening". This correlates with condition that emerged from this accident (8-7). In last paragraph Dr. Wierzbicki observes an established progression of the spinal disc bulge. This Dr. Wierzbicki August 2007 report (8-7) follows a more guarded (in terms of causal nexus) initial report in June 2007 (8-8). Reading the two together it is apparent to a fact finder that Dr. Wierzbicki was careful, and gathered the medical evidence, he needed. Once Dr. Wierzbicki had all pertinent MRI records and "spinal studies" (8-7), this neurologist was set to opine. Dr. Wierzbicki does so through August 2, 2007 bridging the causal connection to this accident. A reading from the end of Exhibit 8 (8-20) forward shows step by step spinal detective work by Dr. Wierzbicki. Dr. Wierzbicki questions whether this is disc herniation or bulge as he examines the films themselves (8-10). We are now dealing with a careful doctor. The pain is still the same for Mrs. Sullivan. Pain is what she is to be compensated for, whether bulge or herniation. There is bulging at both L3-4 and L4-5 in 2006 Florida MRI studies (8-5). Weakness at one intervertebral level will have corresponding pressure on lower level, and logic tells us that occurs through persistent walking or moving over extended periods of time. The result of the force of gravity at work.

Dr. Bhalani's sworn statement is found at 9-1. There Dr. Bhalani on oath states "to a reasonable degree of certainty" that that injuries he treated Mrs. Sullivan for were caused by this accident.

Defendant can offer in evidence no treater who opines, let alone on oath "to a reasonable degree of certainty", that there was some other incident that caused her headaches, neck pain or most importantly lumbar (low back) disc herniation/bulge. These treating physicians are in best position to opine, as they see the patient.

Treating physicians have the chance to watch the patient over time, and to make comparisons and distinctions in the care to help their patient. Their knowledge, training and experience suits a treating physician well to call what it is that causes the ailment for the patient. Dr. Bhalani begins the injection procedure (9-2). Dr. Bhalani notes the chronicity of low back pain with leg radiculopathy lower extremity is obviously from bulge pinching of nerve root ending in lumbar region) (9-2). Mrs. Sullivan in her testimony described the usual three month intervals for steroid injections for pain relief. Dr. Bhalani's records show injections in 2007 (9-2 to 9-5). Plaintiffs argue that medical doctors at Advanced Pain Management know what they are doing, are specializing in this area, and would not go to this extreme and would not swear that all this was accident caused unless it were the truth.

What of Dr. Bhalani's records, reports, opinions, those of Dr. Wierzbicki, would have changed or diluted the opinion of Dr. Glick for the defense is a subject of speculation. One cannot cross examine or impeach a piece of paper; thus the law of hearsay and its exception in MGL Chapter 233 Sec 79G. This is also the reason why MGL Chapter 233 Sec 79G calls for strict adherence to the statutory provisions to obviate

the usual hearsay exclusion of evidence. If Dr. Glick's report is to be considered at all, it cannot have the weight of Dr. Wierzbicki or Dr. Bhalani's records or of the MRIs. 2007 Good Samaritan Hospital treatment for this patient's back pain in Massachusetts is found in Exhibit 10. A solid cross examination of that defense medical expert would drive home the point that the experts in the line of treatment all point back to this accident as the causative force in producing the permanent back injury from which Mrs. Sullivan suffers.

## IX. DR. JUST AND THE INCONTINENCE

Dr. Just's affidavit, satisfying the requirements of MGL Chapter 233 Sec 79G, is found at 11-1. After Attorney Gluck's report sought to throw out part of the operative procedure on Mrs. Sullivan on non-medical based opinion of no causation, Plaintiff did obtain opinion of Dr. Just. Dr. Just did carefully look at patient history and what was done in January 26, 1996 endoscopic uretha before reaching his conclusion (11-2 to 3). Dr. Just's sworn conclusion is the accident was the proximate cause of "relaxation of pelvic attachments to Mrs. Sullivan's uretha and bladder which resulted in substantial stress incontinence and surgical procedure of January 26, 1996. Again Plaintiffs argue that medical opinions of a treating physician as to medical points are on higher evidentiary plateau than opinions of medicine by a defense lawyer or non-treating, non-examining, non-specialized doctor. Dr. Just's opinion is fact preferred over Attorney Gluck's when it comes to urology because Dr. Just is an urologist (11-2) and Attorney Gluck is a lawyer. In fairness, Attorney Gluck did not have Dr. Just's records or opinion before Attorney Gluck wrote his report and rendered his opinion dismissing this operation, related medical bills, and concept that this accident caused any urological

damage. But a fact remains. It did. Plaintiffs have proved that by the only medical evidence on point and add that it is persuasive evidence as well.

## X. LOSS OF EARNING CAPACITY

The Court has in evidence tax returns (Ex 17). The Attorney Creedon Affidavit (one of several Exhibits in evidence but not in Exhibit Book) allots 5 years @ $5,000 per year for $25,000 in lost wages for Mrs. Sullivan. The Court will recall the testimony of Sullivan Family members of how Mrs. Sullivan performed her cleaning work in homes and offices pre-accident. Loss of earning capacity differs slightly conceptually from lost wages, but is of no major moment in case at bar. Loss of earning capacity when coupled with medical bills is often referred to as the "specials", meaning special damages, in a personal injury case. There is really nothing special about these damages other than that they are matters of arithmetic in adding up. The major damages for Mrs. Sullivan are her 70% of time severe back pain. Lost wages/earning capacity have a verification aspect in this case. The cleaning business was a business that the Sullivans were counting on to help them support themselves. Mrs. Sullivan worked a lifetime. She raised her children. She would not have ceased that business and would not have forgone the needed income derived from the business had it not been for a physically disabling event. Testimony is consistent as to the disabling effect of her back injury; in that it crippled Mrs. Sullivan from performing the reaching, bending and stooping necessary to carry on her cleaning business. The cessation of this cleaning business happens once, right after this accident.

PLAINTIFF, BY THEIR ATTORNEY
ALBERT E. GRADY

/s/Albert E. Grady
ALBERT E. GRADY, ESQ.
BBO# 206020
OFFICE OF ALBERT E. GRADY
226 MONTELLO STREET
BROCKTON, MA 02301
(508) 583-8562

**Joyce Champion and others [1] v. The Upjohn Co.; Joyce Champion and others v. Leonard Morse Hospital and others [2]**

1 David B. Champion, and Lindsay Champion, by her next friend Joyce Champion.

2 William E. Waterman and Lois Lubinsky Rutter.

**91-6479H**

**SUPERIOR COURT OF MASSACHUSETTS, AT MIDDLESEX**

***1993 Mass. Super. LEXIS 26***

**December 23, 1993, Decided**

**DISPOSITION:** [*1] Plaintiffs' Motion to Consolidate ALLOWED.

**CASE SUMMARY:**


**PROCEDURAL POSTURE:** A justice of the appellate court requested a written memorandum explicating the court's order for consolidation of plaintiff patient's claims against defendant medical providers and drug manufacturer.

**OVERVIEW:** The patient jumped or fell from the ledge of her hospital room window and sustained severe and permanent injuries; she was on two medications at the time of the incident. The patient filed a claim against the medical providers alleging medical malpractice for negligent failure to properly supervise and monitor her so as to prevent her injury and the patient filed a products liability suit against the drug manufacturer alleging negligent failure to warn and breach of implied warranties. A justice of the appellate court requested a written memorandum explicating the court's order for consolidation of the two suits. The court stated that common questions of fact existed and that the defense of an intervening and superseding cause warranted consolidation. The court also stated the defendants in both suits raised the defense of contributory negligence and that a consolidated trial would have been a better use of scarce judicial resources.

**OUTCOME:** The court filed a written memorandum and explicated its order allowing consolidation of the patient's two claims.


**LexisNexis(R) Headnotes**

***Civil Procedure > Pretrial Matters > Consolidation of Actions***

[HN1] *Mass. R. Civ. P. 42(a)* permits the consolidation of actions which involve common questions of fact.

***Torts > Negligence > Causation > Proximate Cause > Intervening Causation***
***Torts > Procedure > Multiple Defendants > Distinct & Divisible Harms***

[HN2] A superseding cause breaks the chain of causation. Whether the intervening act breaks the causal nexus depends on the nature and foreseeability of the intervening act or omission. Moreover, whenever two or more causes have combined to bring about harm to a plaintiff, there is a call for the apportionment of the harm to the causes.

***Torts > Malpractice & Professional Liability > Healthcare Providers***
***Torts > Procedure > Multiple Defendants > Distinct & Divisible Harms***

[HN3] An original tortfeasor may be liable not only for the harm which he himself has inflicted, but also for additional damage resulting from the negligent treatment by the medical provider.

***Torts > Negligence > Defenses > Comparative Negligence > General Overview***
***Torts > Negligence > Defenses > Contributory Negligence > General Overview***
***Torts > Procedure > Multiple Defendants > Distinct & Divisible Harms***
[HN4] All defendants must be included in the percentage calculations mandated by the Comparative Negligence Law.

**JUDGES:** Volterra.

**OPINION BY:** VOLTERRA

**OPINION**

Memorandum of Decision on Plaintiff's Motion for Consolidation Pursuant to *Mass.R.Civ.P. 42(a)*

Plaintiff Joyce Champion first brought an action against her medical providers alleging medical malpractice for negligent failure to properly diagnose and treat and for negligent failure to properly supervise and monitor her so as to prevent her injury. Afterward plaintiff Joyce Champion brought a separate action against the defendant Upjohn Company. This second and subsequent suit is a products liability claim alleging negligent failure to warn and claims that Upjohn breached implied warranties for the product Halcion, a benzodiazepines, which is currently a leading sleeping medication.

Plaintiffs and Defendants appeared before me for two extensive motion hearings. During the second such hearing this court orally allowed the Plaintiff's Motion to Consolidate. The parties then appeared before a single justice of the Appeals Court who reversed me. Plaintiffs have filed a Motion for Re-consideration before the single justice. Pursuant to the single justice's order for a written memorandum explicating my order [*2] for consolidation I submit the following as the rationale for consolidating the cases.

[HN1] *Mass.R.Civ.P. 42(a)* permits the consolidation of actions which involve common questions of fact. These two actions seek to assess legal liability for the injuries which the plaintiff sustained when she either fell accidentally or jumped from a third floor hospital window. At the time the plaintiff fell or jumped from the window she had been prescribed an anti-depressant medication, Tofravil, for treatment of depression, and Halcion for sleeping problems. On September 30, 1988 the defendant treating psychiatrist changed the anti-depressant medication from Tofravil to Elavil. The defendant psychiatrist continued the plaintiff on Halcion for her sleeping problems.

On October 10, 1988 plaintiff took an overdose of medication in a purported suicide attempt. An inference can be drawn that the suicide medium the plaintiff selected was Halcion. The inference is permitted as an overdose of Halcion results in deep and prolonged sleep rather than death.

In the early morning of October 10, 1988 the plaintiff was brought to the emergency room of the defendant hospital. Later in the day she was [*3] transferred to the Intensive Care Unit. The transfer was predicated only on monitoring and supervision issues. She was not in any critical health condition. At night her bed in the ICU was needed for another patient. Plaintiff was transferred to a psychiatric unit. Plaintiff opposed the transfer and attempted to elope from the hospital. She was apprehended by hospital staff and returned to the psychiatric unit. The defendant psychiatrist had ordered her to be monitored every fifteen minutes.

Early on the morning of October 11, 1988, after climbing in and out of her hospital window onto the ledge under the window the plaintiff jumped or fell to the ground below. Plaintiff sustained severe and permanent injuries.

Halcion, which is also known by its generic name triazolan, is a prescription sleeping medication manufactured by the defendant Upjohn Company. Halcion was approved by the United States Food and Drug Administration (FDA) in 1982. Although approved by the FDA evidence will be introduced at trial that there are risks associated with the ingestion of this drug. The drug has been withdrawn from the market by some foreign countries; and other foreign regulators have ordered [*4] reduction of the prescribed dosages of this drug. In the United States Upjohn has voluntarily agreed to limit the dosage to .25 mg. Anecdotal incidents similar to what befell the plaintiff are recorded in studies and in the literature on Halcion.

Accordingly the issues to be tried in the Halcion case are:

> a) whether Halcion was the cause or a substantial contributing cause of the plaintiff's injury;
>
> b) whether Upjohn adequately warned of the risk inherent in the use of Halcion which Upjohn knew or should have known at the time the drug was prescribed to the plaintiff;
>
> c) whether Upjohn's failure to warn was the proximate cause of plaintiff's injury; and

d) whether Upjohn breached any implied warranties to Joyce Champion.

The issues to be tried in the medical provider case are:

a) whether the medical providers failed to comply with the appropriate standard of care; and

b) whether any failure to comply with the standard of care was the proximate cause of plaintiff's injury;

Although facially it would seem better to try the cases in tandem with the shorter medical malpractice case going first, the [*5] rub comes in with intervening and superseding cause as a defense. It was represented to Justice Gershengorn that this defense would not be raised by any defendant. Accordingly, she declined to consolidate the cases. The parties then conferenced the case before me as I had been tentatively selected to be the trial judge. At my conference the tune changed radically. It was represented that the issue of intervening and superseding cause would be raised.

I determined that fairness would not permit finger pointing by Upjohn towards the medical providers as an intervening and superseding cause in severed trials. A finding for the defendant in the Halcion trial would then permit the medical defendant to point the finger at Halcion as the intervening and superseding cause in the malpractice trial.

[HN2] A superseding cause breaks the chain of causation. Whether the intervening act breaks the causal nexus depends on the nature and foreseeability of the intervening act or omission. See *Restatement, Second, Torts, 441.*

Moreover, Section 433A of the Restatement applies whenever two or more causes have combined to bring about harm to a plaintiff. Accordingly the Restatement calls for the apportionment [*6] of the harm to the causes.

In these two case consolidation permits an analysis by the jury of the two distinct harms so that there can be a rational basis for determining the contribution of each cause to the single harm.

For example, [HN3] an original tortfeasor may be liable not only for the harm which he himself has inflicted (here the suicide attempt) but also for additional damage resulting from the negligent treatment by the medical provider (here the medical defendants). See Restatement, 457.

Moreover, both the medical defendants and the drug manufacturer raise the defense of contributory negligence in respect to the plaintiff's negligence claims. [HN4] All these defendants must be included in the percentage calculations mandated by the Comparative Negligence Law.

Moreover, consolidated trials will be a better use of scarce judicial resources in the Superior Court. This consideration militates against a plaintiff being forced to try the damage phase of her suits twice to two different juries. The plaintiff would need to bring in the same expert witnesses twice to show the same injury.

For the foregoing considerations I determined that the matters ought to be consoldiated. [*7] Accordingly, I ALLOW the Plaintiffs' Motion to Consolidate.

CERTIFICATE OF SERVICE

I, Albert E. Grady, an Attorney for the Plaintiffs, BBO # 206020 hereby certify on oath that I served a copy of the foregoing Plaintiffs' Amended and Substituted Trial Brief, on Counsel of record, J. Reid Prouty, Department of Justice, Classification Unit, 8th Floor, 1100 L. Street, N.W., Washington, D.C. 20530 via regular mail and that this document filed through the ECF system will be sent to the registered participant as identified on the Notice of Filing this 12th day of September, 2008.

/s/ Albert E. Grady
Albert E. Grady, Esq.
BBO#: 206020
OFFICE OF ALBERT E. GRADY
226 Montello Street
Brockton, MA 02301

Dated: September 12, 2008