# In the United States Court of Federal Claims

Case No. 99-754C
FOR PUBLICATION
Filed: January 5, 2010

* * * * * * * * * * * * * * * * * * * * * * * * * *
                                      *

**NORMA C. SULLIVAN** and        *
**DONALD E. SULLIVAN,**         *      Damages; Breach of Contract;
                           *      No Prejudgment Interest
           *Plaintiffs*,     *
v.                             *
                           *
**THE UNITED STATES**,        *
                           *
           *Defendant.*     *
                           *

* * * * * * * * * * * * * * * * * * * * * * * * * *

*Albert E. Grady*, Brockton, Massachusetts, for Plaintiffs.

*J. Reid Prouty*, Trial Attorney, with whom were *Mark A. Melnick*, Assistant Director, *Jeanne E. Davidson*, Director, and *Gregory G. Katsas*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## OPINION and ORDER

**SMITH**, Senior Judge:

This matter is before the Court following a two-day trial on damages held in Boston, MA. After trial, Plaintiffs filed a Post Trial Brief, Defendant filed a Post Trial Response Brief, and Plaintiffs filed a Reply Brief. Closing arguments were held thereafter.

With liability already determined, this opinion disposes of the sole remaining issue in this case: the calculation of damages owed to Plaintiffs. For the reasons set forth below, the Court finds Plaintiffs' alleged level of injury unrealistic, Plaintiffs' witnesses' testimony and Plaintiffs' evidence inconsistent and incomplete, and Defendant's expert's opinion of the amount of damages to be awarded more persuasive than Plaintiffs. However, the Court does find that Plaintiffs were nevertheless injured and, accordingly, Plaintiffs are hereby **AWARDED** damages in the amount of $32,592.00.

# I. FACTS and BACKGROUND[1]

On July 15, 1995, responding to an emergency need for mail delivery services around suburban Boston, the United States Postal Service (USPS) entered into written contract HCR 023EU (Contract) with TNT Transportation (TNT).  The Contract was standard form, and included a subsection detailing the minimum liability insurance TNT was required to carry, $750,000.00.  Although the USPS contracting officer requested written verification that TNT had acquired the minimum coverage in compliance with the Contract term, TNT did not acquire the insurance.  One month after the Contract was signed, on August 17, 1995, one of TNT's mail delivery trucks hit the Plaintiffs' automobile from behind resulting in bodily injury to Norma Sullivan.  The TNT truck was insured at the then-applicable Massachusetts state minimum liability insurance requirement of $20,000.00 per person, but it did not carry the coverage as required in the Contract.

The Court found Defendant liable in its 2005 opinion.  This current opinion disposes of the sole remaining issue, the calculation of damages owed to the Sullivans as a result of the Government's failure to enforce the insurance policy requirement.

# II. LEGAL STANDARD

The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been if the breaching party had fully performed.  *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).  Plaintiffs have the burden of establishing "reasonable certainty" as to each item within their damages claims.  *Wells Fargo Bank v. United States*, 88 F.3d 1012, 1023 (Fed. Cir. 1996).  "[R]ecovery for speculative damages is precluded."  *Ind. Mich.*, 422 F.3d at 1373.

While Plaintiffs also argue they are entitled to pre-judgment interest, as a matter of law they are not.  *See Library of Cong. v. Shaw*, 478 U.S. 310, 314-15 (1986) (holding that "interest cannot be recovered unless the award of interest was affirmatively and separately contemplated by Congress"); *Orlando Food Corp. v. United States*, 423 F.3d 1318, 1320 (Fed. Cir. 2005) ("As a general rule, the United States is immune from claims seeking an award of interest. . . . The only exception to this general rule . . . is where Congress has expressly provided for interest.") (citation omitted).  Thus, the measure of damages in this case is the non-speculative difference between the money the Plaintiffs would have received from an insurance company had TNT been insured for $750,000.00 and the $20,000.00 amount TNT was actually insured for.

# III. EVIDENCE PRESENTED

During trial, Plaintiffs presented the testimony of six people: themselves, their two sons Daniel and Stephen Sullivan, their daughter Sharon Curry, and an expert on damages, Senator Robert S. Creedon. In addition to oral testimony, Plaintiffs offered and entered into evidence numerous exhibits.  The exhibits included records from doctors who reviewed and wrote

---

[1] For a more thorough discussion of the facts related to this case, see *Sullivan v. United States*, 54 Fed. Cl. 214 (2002) and *Sullivan v. United States*, No. 99-754C, 2005 WL 6115387 (Fed. Cl. July 22, 2005).

opinions on Mrs. Sullivan's medical records, records from doctors who treated Mrs. Sullivan, including her orthopedist after the accident, Dr. Sullivan, and other documents related to the accident, including police reports and documents describing damage to the Sullivans' truck.

Defendant presented the testimony of one person, Ronald Gluck, an expert on damages. In addition to the oral testimony, Defendant offered and entered into evidence the report and a supplemental letter from Mr. Gluck, and a report by a physician who reviewed Mrs. Sullivan's medical records, Dr. Hyman Glick.  That is Mr. Gluck, the expert on damages, and Dr. Glick, the expert physician.

## A.  Mr. and Mrs. Sullivans' Testimony

Mr. Sullivan testified, that at the time of the accident, he was driving and his wife was riding as a restrained passenger in their Ford truck when it was hit on the passenger rear side. (Trial Tr. vol. 1, 38-39, May 28, 2008.) Immediately after the collision he observed his wife "stiffen[ing] up straight and hanging onto her stomach." *Id.* at 39. Mrs. Sullivan was subsequently transported by ambulance to Good Samaritan Medical Center in Brockton, MA, while Mr. Sullivan followed the ambulance in the damaged truck. *Id.* at 39-40.  After being examined and treated at the hospital, Mrs. Sullivan was promptly discharged and prescribed "Tylenol for pain." (Pls.' Ex. 2 at 10.)  At the hospital, Mrs. Sullivan's condition was found to be normal, there was "[n]o evidence of soft tissue trauma," and her final diagnosis was "mild [ ] strain." *Id.* at 7.

Mr. Sullivan further stated that after the accident his wife complained of back pains and that she eventually had an operation to remove a calcium deposit from her stomach, which was attributed to the accident.  He further stated that he and Mrs. Sullivan had not had marital relations since the accident, as compared to their prior once a week relations. *Id.* at 40-43. Finally, Mr. Sullivan testified that prior to the accident he and his wife walked "most of the time in Florida" around the neighborhood of their second home. *Id.* at 42.  He went on to clarify, however, that they first went to Florida in 1995, and then was "not sure" whether the accident was before or after they walked in Florida. *Id.* at 42-43.

Mrs. Sullivan testified to visiting a doctor in 1988 (seven years prior to the accident) for back pains.  (Trial Tr. vol. 1, 52-53, May 28, 2008.)  She described how, despite seeing a doctor for back pain prior to the accident, she enjoyed gardening in her yard, working with her husband at their house cleaning business, and playing with her grandchildren. *Id.* at 66-74.  Following the accident, Mrs. Sullivan stated that she has not been able to garden, has not been able to work at her cleaning business, and cannot play with her grandchildren. *Id.*   Yet, during cross-examination, after being shown a copy of her deposition transcript, Mrs. Sullivan recalled that she had back pains between 1988 and 1995, but no aches great enough to keep her from working. *Id.* at 73-74.

Mrs. Sullivan also stated that she required stomach and bladder surgery after the accident, and that she suffers back pains approximately seventy percent of the time. *Id.*   On cross-examination, Mrs. Sullivan denied that on December 11, 1995 she told Dr. Sullivan, her

orthopedist, that a "miracle had occurred" and that she "felt much better."[2]  *Id.* at 74.  She also denied that a second, unrelated car accident, which required hospitalization in 2007, contributed to her back pain.  *Id.* at 79.  However, doctor's records related to these car accidents do indicate back pain from at least one of the accidents.  (Trial Tr. vol. 2, 267-276, May 29, 2008.)

### B.  The Children's Testimony

The Plaintiffs' children, Daniel Sullivan, Steven Sullivan, and Sharon Curry all testified that their mother has been noticeably less active since the accident.  Daniel Sullivan testified that when he visited his mother, in 1996 "[s]he just wasn't as agile as she used to be."  (Trial Tr. vol. 1, 24, May 28, 2008.)  Steven Sullivan testified that Mrs. Sullivan cannot presently walk more than short distances.  *Id.* at 33.  Finally, Sharon Curry, the Sullivans' daughter, testified that during her annual holiday visits, Mrs. Sullivan used to play with her grandchildren both inside and outside, but since the accident, Mrs. Sullivan mostly sits in a recliner or lawn chair during visits.  *Id.* at 27.

### C.  Senator Creedon's Testimony on Damages

The Plaintiffs' expert on damages, Senator Robert S. Creedon, testified that had there been a $750,000.00 insurance policy in place at the time of the accident, the Plaintiffs' case would have likely settled within "18 months to two years."  (Trial Tr. vol. 2, 121, May 29, 2008.)  He went on to say that there are several formulas used in evaluating personal injury cases to calculate pretrial settlement figures.  *Id.* at 122.  One formula Senator Creedon described at trial, but which did not appear in his expert affidavit, is to settle a case for five times the sum of medical bills and lost wages.  *Id.* at 122-27.  Beyond this, Senator Creedon went on to discuss many considerations in damages awards including level of injury, type of injury, and age.  He concluded direct questioning by stating that in his expert opinion Mrs. Sullivan would have settled her case "18 months or two years after [the] accident" for "around $260,000."[3]  *Id.* at 132.

On cross examination, Senator Creedon stated that the largest component of his $260,000.00 damages award estimate, $182,000.00, is for Mrs. Sullivan's estimated fifteen-percent disability.  *Id.* at 152.  He went on to state that "his review of the medical documents did not reveal those opinions [a fifteen-percent disability] from a physician."  *Id.*  He concluded by agreeing with Defendant's attorney that Mrs. Sullivan's breaks in treatment would be considered when evaluating the value of the case.  *Id* at 166.

---

[2] Dr. Sullivan's medical records for Mrs. Sullivan state that on December 11, 1995, Mrs. Sullivan "came in and . . . said that some kind of miracle had happened.  She was quite comfortable.  Her back pain is gone."  (Pls.' Ex. 5 at 32.)

[3] Senator Creedon also testified to interest being added to the settlement figure; however, per the discussion *supra*, interest cannot be recovered.

### D.  Plaintiffs' Evidence Regarding Permanent Disability

To support Mrs. Sullivan's claim of permanent disability, Plaintiffs submitted into evidence an expert report by Dr. Timothy Wierzbicki regarding Mrs. Sullivan's back pain. (Pls.' Ex. 8 at 8-9.)  Dr. Wierzbicki spoke with Mrs. Sullivan via telephone, and "review[ed] records and spinal imaging studies for analysis of her case medically and neurologically." *Id.* at 8.  Dr. Wierzbicki was told by Mrs. Sullivan that she had "no recognized lumbar spine symptoms prior to her motor vehicle accident," and wrote "I was candid in my assessment that proof of cause and effect would be largely predicated on the establishment of normal baseline spinal films prior to the date of her accident."  *Id.*  Dr. Wierzbicki was never provided baseline spinal films from prior to the date of the accident, but in a letter dated August 2, 2007, he opined that Mrs. Sullivan's back problems "correlate" with her accident.  *Id.*

### E.  Defendant's Evidence and Expert's Testimony on Damages

Mr. Gluck testified that the value of a case is related to a plaintiff's medical bills, lost earnings, and medical records.  (Trial Tr. vol. 2, 239, May 29, 2008.)  He stated that from his investigation of Mrs. Sullivan's records, she was making a claim for "a cervical injury . . . lumbar injury, a low back injury . . . a permanent problem that was related to the accident . . . a bladder injury, and an abdominal mass . . . [a]nd Mr. Sullivan was making a claim for loss of consortium." *Id.* at 240.

Mr. Gluck described how Mrs. Sullivan's medical bills totaled $17,552.00; however, that figure included expenses related to Mrs. Sullivan's bladder surgery which he felt "was not proven, because there was no causation letter." *Id.* at 240.  With respect to Mrs. Sullivan's lost earnings, Mr. Gluck stated that he would "[give] her lost wages of $100 per week, which is what she said she earned . . . [for] about 20 weeks." *Id.* at 246.  That amount of time represented the period during which Mrs. Sullivan had to stop working due to pain until the point where Dr. Sullivan stopped treating her for injuries.  *Id.*  Mr. Gluck noted that according to Dr. Sullivan's medical records, Mrs. Sullivan worked from the time of the accident, mid-August 1995, until around mid-November 1995, when the reports indicate that her symptoms increased "after hanging curtains at home." *Id.* at 251.  Dr. Sullivan further reported that her back was "much better, no question about it," during Mrs. Sullivan's next visit, and Mrs. Sullivan did not see Dr. Sullivan again until March 1996.  (Trial Tr. vol. 1, 33-40, May 28, 2008.)

During this time, in January 1996, Mrs. Sullivan also complained about frequency in urination and underwent surgery to correct stress incontinence.  After March 1996, Mrs. Sullivan did not see Dr. Sullivan or any physician for back problems again until 2006.[4]  (Trial Tr. vol. 2, 250-60, May 29, 2008.)  Overall, Mr. Gluck's evaluation of Mrs. Sullivan's medical records indicate that in his opinion, an insurance company would devalue Mrs. Sullivan's case due to unrelated post-accident incidents and inconsistent reports of symptoms by Mrs. Sullivan.  *Id.* at 254-57.

---

[4] Mrs. Sullivan's medical treatment in Daytona Beach, FL in late 1997 and early 1998 was for unrelated neck problems.

Mr. Gluck concluded that Mrs. Sullivan's case was worth $52,592.00 between 1996 and 1998. That amount included $17,552.00 for medical bills and $2,000.00 for lost earnings. *Id.* at 257-62. The amount also included pain and suffering at $180.00 per week from the date of the accident to the last day Mrs. Sullivan had treatments with Dr. Sullivan ($5,040.00), and $20,000.00 for medical bills and pain and suffering associated with abdominal surgery which had a medical causation report stating that abdominal trauma related to the accident necessitated the surgery. *Id.* Finally, the $52,592.00 figure included an award of $8,000.00 to Mr. Sullivan for loss of consortium. *Id.*

Mr. Gluck ended his direct testimony by stating that Mrs. Sullivan's medical records from 1998, 2005, and 2006 fail to present any evidence of back pain, but do indicate a second car accident in 2006. *Id.* at 267. Medical records from 2007 indicate a third car accident which resulted in slight exacerbation of Mrs. Sullivan's back pain. *Id.* at 275-76.

With regard to whether he believed that Mrs. Sullivan had suffered a permanent spinal injury, Mr. Gluck stated that:

> "Assessing permanent disability is the domain of a doctor who is qualified in the field. And there is no doctor in this case, based on the records that I've seen, who has said that Mrs. Sullivan has a permanent disability. No doctor has said that she has a 15 percent disability."

*Id.* at 263. When asked whether an attorney or claims adjuster could approximate such a figure, Mr. Gluck responded that "in my experience, doing this [for] 28 years, that's never happened." *Id.* at 263. Mr. Gluck also made clear that Dr. Wierzbicki's report on causation would not be helpful to Plaintiffs because it was based on incomplete facts. *Id.* at 279.

On cross examination, Mr. Gluck admitted that "other than the car accident [at issue in this case] . . . the hanging of the curtains and the shaving of the legs [incidents mentioned in the medical reports]" and the 2006 and 2007 car accidents, there are no other "incidence[s] of a traumatic nature." *Id.* at 319-20. He also agreed that once a person hurts his or her spine, it can become more susceptible to re-injury. *Id.* at 293. Finally, on re-direct, Mr. Gluck stated that back pain can occur without trauma. *Id.* at 328.

## IV. FINDINGS and AWARD

While the Court believes Mrs. Sullivan was injured at the time of the impact, from the evidence presented the Court finds the level of permanent injury and damages argued by Plaintiffs is unrealistic. The truck in which Mr. and Mrs. Sullivan were riding was drivable immediately after the accident, and Mrs. Sullivan sustained no conspicuous injuries as detailed by the emergency room reports. The Court recognizes that sustainable injuries can certainly occur beyond those found in a typical emergency room visit, but Mrs. Sullivan's direct return to work after the accident, and the almost three month delay in treatment after the accident, leads the Court to conclude that Mrs. Sullivan did not suffer injury tantamount to the level of permanent disability Plaintiffs allege.

Furthermore, while the Court agrees with both Plaintiffs' and Defendant's experts that Mrs. Sullivan should recover for the time when she was unable to work due to medical treatment (from the date of the accident to her last treatment with Dr. Sullivan in March 1996), the Court finds no medical evidence from the time of the accident to when Mrs. Sullivan stopped seeing Dr. Sullivan that would indicate she was left in a permanently disabled state after March 1996. Instead, most of the Plaintiffs' witnesses' testimony revealed that Mrs. Sullivan was only less mobile after the accident, not permanently disabled.

Other inconsistencies in the evidence testimony presented too many questions to allow any clear conclusions to be drawn.  Mrs. Sullivan says her back was fine before the accident, medical records indicate otherwise.  Further, although Mr. Sullivan and the Sullivan children state that Mrs. Sullivan has been unable to walk long distances, Mr. Sullivan could not remember if he and Mrs. Sullivan walked around their Florida home before or after the accident. And finally, while Mrs. Sullivan says she did not injure her back in the second or third car accident, the medical records indicate that she did.

Despite Dr. Wierzbicki's report stating that Mrs. Sullivan's now-existing back problems "correlate with a historical era in which the patient developed lower back pain following [the 1995 accident]," it falls short of clearly linking the accident to the back problems.  *Id.* Combining Dr. Wierzbicki's carefully restrained words with Mrs. Sullivan's misstatements to the doctor about not experiencing back pain prior to the accident, the Court is hard-pressed to find evidence of permanent disability caused by the accident in the letter.[5]  Accordingly, the Court finds the testimony and medical reports insufficient to prove that Mrs. Sullivan suffered permanent disability from the 1995 accident.

However, the Court finds that the Sullivans are able recover damages for the time period from when Mrs. Sullivan was unable to work due to medical treatment.  This is from the date of the accident, August 17, 1995 to her last treatment with Dr. Sullivan in March 1996.  The Court further finds that the Sullivans are entitled to recover for their medical costs plus loss of consortium. For the proper award calculation, the Court finds Defendant's expert's opinion and analysis more persuasive. Therefore, by employing the Defendant's model, the Court finds Plaintiffs are entitled to an award of $52,592.00.  This amount, however, must be offset by the $20,000 Plaintiffs have already been awarded from TNT's state minimum liability insurance. Therefore, Plaintiffs are awarded damages in the amount of $32,592.00.

---

[5] It should be mentioned that Defendants submitted their own expert report from Dr. Hyman Glick.  At trial, Plaintiffs objected to Dr. Glick's report being submitted on the grounds that it did not comply with Chapter 223, Section 79 G of the Massachusetts General Laws. While the Court overruled Plaintiffs' objection at trial, Plaintiffs present it again in their post-trial brief.  (Pls.' Br. at 4.)  Since the Court finds that Dr. Wierzbicki's report falls short of establishing that the 1995 accident caused permanent disability to Mrs. Sullivan, the Court need not address the issue of whether Dr. Glick's report needs to comply with Massachusetts General Laws or compare Dr. Glick's report to Dr. Wierzbicki's.

## V. CONCLUSION

For the reasons set forth above, the Court hereby **AWARDS** Plaintiffs damages in the amount of $32,592.00.  The Clerk is directed to enter final judgment accordingly.

**It is so ORDERED.**

   s/Loren A. Smith
LOREN A. SMITH
SENIOR JUDGE